Ryan S. Anderson, Esq. (State Bar #290654)
Anderson Hayes, P.C.
PO Box 752
6014 La Granada
Rancho Santa Fe, CA  92067
858-756-5558; Fax 858-756-8884
Ryan@AndersonHayes.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| **JOHN ERVING**, an individual and as Trustee of the John Erving Family Trust<br><br>Plaintiff,<br><br>vs.<br><br>**SEARCH INITIATIVES, INC.**, a Delaware Corporation, **SINGLE OAK VENTURES, LP**, a Delaware Limited Partnership, **HANCOCK VENTURES, LLC**, a Delaware Limited Liability Company, **CALLE CAPITAL CORPORATION**, a Nevada Corporation, **SECURE SEARCH, LLC**, a California Limited Liability Company, **TIMOTHY JUDD**, an individual, **RALPH WILLIAMS**, an individual, **ALI RIAZ**, an individual, **WILLIAM BLEVINS**, an individual, **STANLEY G. ROSEN**, an individual, **LOUIS PETROSSI**, an individual, and **DOES 1-10**, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR MONETARY DAMAGES, RESCISSION AND INJUNCTIVE RELIEF**<br><br>1) **SECURITIES FRAUD**<br>2) **INTENTIONAL MISREPRESENTATION**<br>3) **NEGLIGENT MISREPRESENTATION**<br>4) **INNOCENT MISREPRESENTATION**<br>5) **RESCISSION OF CONTRACT PURSUANT TO SECTION 29(b) OF THE SECURITIES AND EXCHANGE ACT OF 1934**<br>6) **VIOLATION OF SECTION 20(a) OF THE SECURITIES AND EXCHANGE ACT OF 1934**<br><br>Date:<br>Time:<br>Dept:<br>Judge:<br>Trial Date: |

## STATEMENT OF THE CASE

Plaintiff John Erving, an individual and as Trustee of the John Erving Family Trust, dated October 14, 2011, has invested one hundred ninety two thousand five hundred dollars ($192,500.00) in Defendant Search Initiatives, Inc. (hereinafter "SI" or the "Company"), based on false statements by SI regarding non-existent contracts with multinational corporations, its

1

profitability and representations that it was not paying sales commissions to either registered or unregistered broker dealers. Plaintiff has discovered that Defendant SI had no contract with the multinational company it claimed to have contracted with, that it is not and never has been profitable, and that it has been paying vast sums of money as sales commissions disguised as "Finders Fees" to unregistered broker dealers in contravention of federal and state laws. Plaintiff herein sues to recover monetary damages for such misrepresentations, rescission of his voidable contract with Defendant SI, and for injunctive relief.

## STATEMENT OF FACTS

### Parties

**A.**   **Plaintiff**

1. Plaintiff John Erving sues as an individual and as Trustee of the John Erving Family Trust, dated October 14, 2011. Mr. Erving is a resident of the State of Michigan. The John Erving Family Trust is the record holder of sixty-six thousand two hundred fifty shares in SI. Mr. Erving acquired these shares through the following transactions:

   a. On or about March 2011, Erving, as an individual, purchased twenty-five thousand preferred units, at two dollars ($2.00) per unit, in Search Initiatives, LLC., a Nevada Limited Liability Company that has since converted into Defendant SI, a Delaware Corporation. By virtue of the conversion, each of these units was converted into a corresponding share of Class E Preferred Stock in SI. These shares have since been transferred to the John Erving Family Trust.

   b. On or about August 2013, Erving, as Trustee of the John Erving Family Trust, purchased twenty thousand shares, at five dollars ($5.00) per share, of Common Stock in SI.

   c. On or about June 2014, Erving, as Trustee of the John Erving Family Trust, acquired 21,250 shares of Class E Preferred Stock in SI as part of the estate settlement of the Mary Allard Trust.

**B.     Defendants**

2.  Defendant Search Initiatives, Inc. is a Delaware Corporation in good standing.  SI was incorporated on or about December 27, 2012. SI's corporate headquarters is located at 25240 Hancock Ave., Suite 410, Murrieta, California.

3.  Defendant Single Oak Ventures, LP (hereinafter "Single Oak") is a Delaware Limited Partnership in good standing. Single Oak's corporate headquarters is located at 25240 Hancock Ave., Suite 405, Murrieta, California.

4.  Single Oak is controlled and operated by Ralph Williams, Directors of SI, and Defendant Louis Petrossi. Plaintiff is informed and believes and thereon alleges that Defendant Single Oak is an alter ego of SI.

5.  Defendant Hancock Ventures, LLC (hereinafter "Hancock") is a Delaware Limited Liability Company in good standing. Hancock's corporate headquarters is also located at 25240 Hancock Avenue, Suite 405, Murrieta, California.

6.  Hancock is controlled and operated by SI Director Ralph Williams. Defendant Louis Petrossi is also a Manager of Hancock. Hancock is a General Partner of Single Oak. Plaintiff is informed and believes and thereon alleges that Defendant Hancock is an alter ego of SI.

7.  Defendant Calle Capital Corporation (hereinafter "Calle Capital") is a Nevada corporation in good standing. Calle Capital's corporate headquarters is located at 25240 Hancock Ave., Suite 410, Murrieta, California.

8.  Calle Capital is controlled by Ralph Williams, a Director of SI. Plaintiff is informed and believes and thereon alleges that Defendant Calle Capital is an alter ego of SI. Among the chief assets of Calle Capital are three boat slips in Oceanside, CA.

9.  Defendant Ralph Williams is a resident of the State of California. Mr. Williams is a Director of SI and Calle Capital, a member of Hancock, and a general partner in Single Oaks. Mr. Williams serves as the Chief Financial Officer to all of these entities.

10. Defendant Timothy Judd is a resident of the State of California. Mr. Judd is a Director of

SI and also serves as its Chief Executive Officer.

11. Defendant Ali Riaz is a resident of the State of California and a Director of SI.

12. Director William Blevins is a resident of the State of Virginia and a Director of SI.

13. Director Stanley G. Rosen is a resident of the State of California and a Director of SI.

14. Defendant Louis Petrossi is a resident of the State of Nevada and formerly licensed by the Financial Industry Regulatory Authority as a broker/dealer under license number CRD# 723168. Mr. Petrossi is also the President, Treasurer, and Director of Chadwicke, Inc.

## C.   Doe Defendants

15. The SI corporate family includes a multitude of subsidiaries and affiliated companies, in the US and abroad. Top officers and board members, such as Timothy Judd and Ralph Williams, maintain executive positions in which they control the operations and finances of the various interconnected enterprises. Several of these entities are headquartered in the same conjoining office space in Murrieta, California. Many affiliated companies of the SI corporate family also share the same registered agent, and even conduct business for the various entities during SI shareholder meetings.

16. During Plaintiff's review of records provided by Defendant SI pursuant to Delaware General Corporations Code Section 220, Plaintiff discovered that Defendant SI has engaged in numerous financial transactions with the SI corporate family members listed above, as well as unknown entities believed to be members. Defendants Single Oaks, Calle Capital, and Hancock Ventures also shares the same physical office space with Defendant SI, the same Directors and Officers, as well as utilizes the same infrastructure to raise investment and communicate with investors. It is based on such unity of ownership and financial interconnectedness that Plaintiff alleges, on information and belief, that these Defendants and currently unknown Doe Defendants are alter egos of Defendant SI.

17. Plaintiff is presently unable to confirm the existence or identity of some of SI's other

subsidiaries and/or affiliated companies, however, Plaintiff has discovered numerous wire transfers to various unknown persons and/or individuals. Plaintiff, based upon information found in Defendant SI's corporate documents, believes that some of these wire transfers involved entities sharing the same properties discussed in paragraph 16 and therefore, pursuant to Local Rule 19-1, includes such fictitious defendants herein as Does 1-10. Discovery will allow Plaintiff to proceed with naming additional companies and persons affiliated with SI.

**D.  Agents and Co-Conspirators**

18. At all times herein mentioned, each of the Defendants hereinabove was the agent, servant, employee, partner, alter ego, aider and abettor, co-conspirator and/or joint venturer of each of the remaining Defendants, and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture. Each Defendant has ratified and approved the acts of each of the remaining Defendants.

**E.  Other Parties**

19. Mary Allard (hereinafter "Allard"), Trustee of the Mary Allard Trust, was a resident of the State of Michigan and an investor in SI, prior to her death in November 2011. Pursuant to a judgment in the Superior Court of Michigan, Plaintiff Erving was awarded 21,250 shares of SI, at the original $2.00 per share price, as payment in full for trust executor services performed by Plaintiff John Erving upon settlement of Ms. Allard's trust subsequent to her death.

20. Search Initiatives, LLC was a Nevada Limited Liability Company organized on or about April 2006. Search Initiatives, LLC converted into a Delaware Corporation on or about December 28, 2012. This Delaware Corporation was and is Defendant Search Initiatives, Inc.

21. Chadwicke, Inc. is a Nevada Corporation, in good standing. Defendant Louis Petrossi is the President, Treasurer, and Director. Chadwicke, Inc. was listed on Search Initiatives,

LLC's June 2006 Notice of Exempt Offering of Securities with the Securities and Exchange Commission as a party to whom Search Initiatives, LLC would be paying "commission or similar remuneration for solicitation of purchasers in connection with the sales of securities in the offering." (See **Exhibit 1**).

22. Russell T. Doe is a resident of the State of California. He is not currently a registered Broker Dealer with FINRA, but was a registered Broker Dealer with FINRA in 2013 under CRD# 1974335.

23. Brian C. Jensen is a resident of the State of Idaho. He is currently a registered Broker Dealer with FINRA, and has been since 2011, with Kestra Investment Services, LLC under CRD#2422495.

## Jurisdiction and Venue

24. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b), 15, and 29(b) of the 1934 Act, SEC Rule 10b-5, and state law. This Court has related claim jurisdiction over the state law tort claims pursuant to 28 U.S.C. §1367.

25. The amount in controversy exceeds $75,000.00 and there is diversity of citizenship between the parties.

26. Venue is proper in this district pursuant to §27 of the 1934 Act. Defendant SI and its officers and directors reside and/or are headquartered in this district, and Defendant SI regularly conducts its business from this district.

27. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## Statement of Facts

28. On or about April 24, 2006, Search Initiatives, LLC filed a Notice of Exempt Offering of Securities with the United States Securities and Exchange Commission (hereinafter

"SEC"). This Notice only applied to the sale of Class B Units of Membership Interest, not the D-2 Units purchased by Plaintiff. This Notice also stated that Search Initiatives, LLC would be paying sales commissions to Chadwicke, Inc. (See **Exhibit 1**).

29. No filing is on record with the SEC for the sale of the Series D-2 Units sold to Plaintiff in 2011, and no other Notices of Exempt Offerings were filed with the SEC until July 6, 2012.

30. On or about February 15-19, 2011, Plaintiff and Ms. Allard attended the "Freedom Fest" investment conference at Atlantis Paradise Resort on Paradise Island, Bahamas. At this investment conference, SI pitched their company's investment opportunity to potential investors.

31. At this conference, Defendant Petrossi approached Plaintiff and Ms. Allard to introduce and solicit the SI investment opportunity. Mr. Petrossi specifically advised Mr. Erving of the company's growing business, its audited accounting, its relationship with reputable Los Angeles law firm Paul Hastings, and even stated that the Company was profitable. **In fact, SI has never been profitable in its history.**

32. In soliciting John Erving and Mary Allard to invest in SI, Mr. Petrossi informed Mr. Erving and Ms. Allard that SI fit his criteria for investment of his clients' money, and most importantly, he himself was also an investor in the company. **Mr. Petrossi effectively endorsed SI to further his solicitation.**

33. Additionally, Mr. Petrossi advised Mr. Erving that under this offering, he would be purchasing shares that included matching warrants, permitting him to purchase additional shares at a set price upon the Company going public. The Company's purported profitability, along with Mr. Petrossi's own endorsement of SI, was the primary factor in procuring Mr. Erving's original fifty thousand dollar ($50,000) investment and that of Ms. Allard, whose shares now largely belong to the John Erving Family Trust. At that time, Mr. Erving and Ms. Allard's investments amounted to 25,000 shares apiece.

34. On or about July 6, 2012, Defendant SI filed a Notice of Exempt Offering of Securities

7

with the SEC. **Said Notice stated that Defendant SI was not going to be paying any sales compensation to any Broker or Dealer.** (See **Exhibit 2**)

35. On or about May 31, 2013, Defendant SI filed a Notice of Exempt Offering of Securities with the SEC. Said notice stated that Defendant SI was currently offering equity to qualified investors under Rule 506. **This Notice also stated that no sales compensation was to be paid to any Broker or Dealer.** (See **Exhibit 3**)

36. On or about July 23-26, 2013, Plaintiff attended the Agora Financial Investment Symposium in Vancouver, British Columbia, where SI was again present, represented by Defendants Petrossi and Williams. Defendant Petrossi used the financial conference to again solicit investment from potential investors by extolling the advantages of an investment in SI, thereby enticing investors to invest in SI. Just as in 2011, Mr. Petrossi advised conference participants that high-risk companies have a place in each investor's portfolio, but the challenge was finding the *correct* high-risk, high reward investment opportunity. Mr Petrossi endorsed SI, stating that SI <u>was</u> the *correct* type of Company that fit his own personal high-risk, high reward criteria, furthering his solicitation efforts.

37. Mr. Williams followed up Mr. Petrossi's solicitation by proclaiming that SI had entered into an agreement with Nokia to place SI's pay per call platform on each Nokia phone sold to consumers. This was monumental news regarding the Company's future success and the prospect for an investment in 2013 having a high return yield at a later date. **In fact, Mr. Williams' statement regarding the Nokia deal was not true**.

38. Based solely off Mr. Williams' announcement regarding the supposed deal with Nokia, Erving invested another one hundred thousand dollars ($100,000) into SI for twenty thousand shares.

39. Despite Mr. Williams making the Nokia announcement as if a deal had already been reached, in fact, such a deal had not been reached. In response to a question posed about the status of the Nokia deal by Plaintiff to SI CEO Timothy Judd on September 26, 2013, Mr. Judd responded that the deal "wasn't going to happen." No explanation was given to

clarify Mr. Williams' previous assertion at the Agora Financial Investment Symposium two months earlier that the Nokia deal was complete. Plaintiff, however, had already relied upon Defendant Williams' previous assertion and had invested an additional $100,000.00.

40. On or about April 24, 2014, SI held a webinar conference call for investors wherein the company simultaneously announced a problem it had encountered in the development of its product, and that it believed it had developed a potentially patentable solution to said problem. SI described the problem as relating to the automated feature that would be used to call a small business owner by a user clicking on the business's phone number on the web. The company would then bill the small business owner receiving the call because the user's phone would be using a company owned phone number to reroute the call to the business.  The company believed that it had solved the problem by using a large list of rotating numbers, allowing multiple users to operate the service simultaneously. **However, this announced problem with the very basics of their product seemed to run contrary to the so-called completed deal with Nokia that Defendant Williams had stated months earlier**.

41. On or about October 2, 2014, Plaintiff traveled to Temecula, CA to attend a SI shareholder update meeting. Prior to the start of the meeting, Plaintiff engaged Mr. Petrossi in a conversation regarding the status of the company and its future outlook. Mr. Petrossi stated that SI had resolved its technical problems and the Board was considering spinning off the patentable technology as possibly two separate companies. **This was not true.**

42. During the meeting, Judd and Williams discussed that (1) they had not overcome problems with the platform, (2) although they had discussed the legal defensibility of unknown patentable technology, they did not have any patentable technology, (3) they had terminated two engineering teams working on the software problems, and (4) had given Maxim Group, LLC the exclusive right to negotiate any acquisition of SI.

43. Despite this barrage of negative news for shareholders regarding their investment in SI, Defendant Williams took the opportunity to inform SI shareholders of his new venture, Single Oaks Venture Capital. Thereafter, Mr. Petrossi solicited investment in Single Oaks. **All of this Single Oaks business was done at a SI shareholder meeting.**

44. Following the presentations by Williams and Petrossi, Plaintiff asked Defendant Williams about the financial condition of the company. Mr. Williams answered that he did not know the Company's financial condition at the time, and Plaintiff's question would need to be directed to the Company's "bookkeeper." Mr. Erving was shocked to learn that the CFO of the Company was unaware of the finances of the Company, causing Mr. Erving to become extremely concerned regarding his investment.

45. Following the shareholder meeting, on or about October 22, 2014, Plaintiff requested that he be permitted to inspect the books and records of the Company.

46. After receiving resistance from the Company regarding its books and records, Plaintiff hired a private investigator to investigate the Company, its assets, and its officers and directors further. Plaintiff's investigator is a Certified Fraud Examiner and former twelve-year veteran of the Federal Bureau of Investigation, where he served as a Special Agent. Plaintiff has also retained a licensed forensic accountant holding the distinguished Financial Forensics certification, Certified Fraud Examiner title, as well as being a CPA, to investigate the finances of the Company. Each has found substantial corporate corruption including, but not limited to, rampant self-dealing on the part of officers and directors, corrupted books of original entry, and diversion of Company funds to personnel not associated with the Company and serving as unlicensed broker dealers in contravention of Company disclosure documents with the SEC.

47. These agents also discovered several irregularities regarding SI's Officers and Directors, namely Judd and Williams' intermixing of business between SI and related companies without any disclosures regarding potential conflicts of interest, much less minutes of the Board authorizing such transactions.

10

48. The following transactions were uncovered as part of Plaintiff's investigator's financial investigation:

    a. On or about June 19, 2015, SI wire transferred thirty five thousand dollars ($35,000.00) to Calle Capital, a Nevada Corporation controlled by Ralph Williams whose chief assets include three boat slips in San Diego County, California;

    b. On or about June 23, 2015, SI received a deposit in the amount of three thousand eight hundred sixty three dollars ($3,863.00). Previously, on the same day, _an identical amount_ was withdrawn from the account of Hancock, a Delaware Limited Liability Company controlled by Ralph Williams and Louis Petrossi. Hancock is also the General Partner for Single Oak Ventures, yet another entity controlled by Ralph Williams and Louis Petrossi;

    c. Between May 1, 2015 and July 31, 2015, SI made wire transfers from its bank account to unknown recipients in the amount of approximately three hundred fourteen thousand six hundred sixty two dollars ($314,662.00);

    d. SI made payments to ADP Tax Financial in excess of six hundred thousand dollars ($600,000.00) despite the Company never having reported a profit in its history;

    e. Plaintiff later discovered that despite Judd and Williams earning $243,497.00 and $212,785.05, respectively, in the year 2011, Judd and Williams caused the Company to provide each of them with housing/automobile/personal expense allowances totaling $14,866.73 and $17,533.21, respectively. This extreme abuse of corporate authority was done despite the Company having never turned a profit in its existence and without a vote of the Board authorizing such transactions.

49. On or about September 16, 2015, Plaintiff, his investigator, and attorney Ryan Anderson ("Plaintiff's Team") traveled to SI headquarters in Murrieta, California to review the books and records of SI, as well as to address the financial irregularities discussed

immediately above with Mr. Judd and Mr. Williams. After Plaintiff's disclosure of the financial irregularities, but before being given a chance to review the books and records of SI, Mr. Judd and Mr. Williams asked Plaintiff's Team to leave the premises.

50. Following Mr. Judd and Mr. Williams' abrupt termination of the September 16, 2015 meeting without permitting Mr. Erving's inspection of the books and records, on or about October 5, 2015, John Erving wrote the Board of Directors of SI to formally demand said inspection. This demand was made pursuant to the Bylaws of SI and Delaware Corporations Code Section 220. Based on his investigator's findings, Mr. Erving cited corporate wrongdoing and suspected breaches of the duty of loyalty involving insider transactions without adequate disclosures as the basis for said Section 220 demand. (See **Exhibit 4**).

51. Between October 19, 2015 and December 27, 2015, nine (9) separate communications between Defendant SI and Plaintiff were required for Plaintiff to have access to less than half of the records requested in his demand of October 5, 2016. This was in spite of his right to such records as a shareholder through the Bylaws of Defendant SI.

52. On or about January 12, 2016, Plaintiff and his agents traveled to SI headquarters in Murrieta, California to perform the records inspection. Plaintiff was provided with copies of the following records:

   a. General Ledger of SI transactions between January 1, 2011 and December 31, 2015;

   b. All minutes of the Board of Directors of SI between January 1, 2011 and December 31, 2015;

   c. Tax information for the years 2011 through 2014;

   d. Compensation records for officers of SI;

   e. Stock holder list as of December 31, 2015.

53. Over the next month and a half, Plaintiff and his agents spent considerable time and expense combing through the over twenty five thousand (25,000) pages of general ledger

12

data and other records that were provided to Plaintiff. This task was made considerably more difficult by Defendant preparing such data in a format that was electronically unsearchable by Plaintiff.

54. During this review of the SI General Ledger, Plaintiff discovered that SI had been regularly paying Defendant Louis Petrossi sums equivalent to ten percent (10%) of investments by outside investors within days of such investment being deposited with SI.

55. Plaintiff is informed and believes and thereon alleges that such sums paid to Mr. Petrossi are commissions on the sale of SI' securities to outside investors in contravention of Defendant's Notice of Exempt Offering of Securities filed with the United States Securities and Exchange Commission. Examples of such transactions include:

   a. On or about February 13, 2013, Plaintiff is informed and believes and thereon alleges that SI paid "Finders Fees" of $5,000 for an investment transaction occurring on February 11, 2013 in the amount of $50,000.00;

   b. On or about April 10, 2013, Plaintiff is informed and believes and thereon alleges that SI paid "Finders Fees" of twenty thousand dollars ($20,000.00) to a single person/entity for two separate investment transactions of $100,000.00 each, both occurring on or about April 9, 2013;

   c. On or about April 16, 2013, Plaintiff is informed and believes and thereon alleges that SI paid "Finders Fees" of five thousand dollars ($5,000) for an investment transaction of $50,000 occurring on or about April 15, 2013;

   d. On or about April 25, 2013, Plaintiff is informed and believes and thereon alleges that SI paid "Finders Fees" of ten thousand dollars ($10,000.00) for an investment transaction of $100,000 occurring on or about April 24, 2013;

   e. On or about July 2, 2013, Plaintiff is informed and believes and thereon alleges that SI paid "Finders Fees" of thirty thousand dollars ($30,000.00) for an investment transaction of $300,000.00 occurring on or about June 24, 2013.

56. Additionally, Plaintiff also discovered twenty-nine transactions involving Defendant

13

Petrossi serving as a dealer in 2013. The following sampling of the twenty-nine transactions stated herein are as follows:

    a. On or about April 29, 2013, Plaintiff is informed and believes and thereon alleges that Defendant Petrossi received twelve thousand one hundred eighty (12,180) shares of SI stock from SI, and thereafter transferred said shares, worth $29,000.00, to shareholder Valentina Shvelsova.

    b. Also, on or about April 29, 2013, Plaintiff is informed and believes and thereon alleges that Mr. Petrossi received four thousand seven hundred twenty-five (4,725) shares of SI stock from SI, and thereafter transferred said shares, worth $11,250.00, to shareholder BM Dreams, LLC.

    c. Also, on or about April 29, 2013, Plaintiff is informed and believes and thereon alleges that Mr. Petrossi received nine thousand four hundred fifty (9,450) shares of SI stock from SI, and thereafter transferred said shares, worth $22,500, to shareholder Star Beachboys, Inc.

    d. Also, on or about April 29, 2013, Plaintiff is informed and believes and thereon alleges that Mr. Petrossi received nine thousand four hundred fifty (9,450) shares of SI stock from SI, and thereafter transferred said shares, worth $22,500, to shareholder Robert E. Swift.

    e. On or about May 20, 2013, Plaintiff is informed and believes and thereon alleges that Mr. Petrossi received one thousand eight hundred ninety (1,890) shares of SI stock from SI, and thereafter transferred said shares, worth $4,500, to shareholder Access Resource Investments.

57. Plaintiff is informed and believes and thereon alleges, based upon information gleaned from the SI General Ledger, that Defendant SI also paid illegal compensation, in the form of sales commissions, to Defendants Doe, Jensen and others. Examples of such transactions are listed herein as follows:

    a. On or about December 31, 2013, Plaintiff is informed and believes and thereon

14

alleges that Defendant Doe received sales commissions of $59,500.00 in the form of stock and/or cash as compensation for investor solicitation services provided to Defendant SI. Said transaction was labeled "Finders Fees" in the SI General Ledger;

    b.  On or about June 13, 2014, Plaintiff is informed and believes and thereon alleges that Doe received sales commissions of $30,000.00 in the form of stock and/or cash as compensation for investor solicitation services provided to SI. Said transaction was labeled "Finders Fees" in the SI General Ledger;

    c.  On or about July 31, 2013, Plaintiff is informed and believes and thereon alleges that Defendant Jensen received sales commissions of $60,000.00 in the form of stock and/or cash as compensation for investor solicitation services provided to SI. Said transactions were labeled "Finders Fees" in the SI General Ledger.

58. For fiscal year 2013 alone, based on the records provided by SI, Plaintiff is informed and believes and thereon alleges that Defendant SI paid at least five hundred seventy-seven thousand six hundred sixty dollars ($577,660.00) in "Finders Fees." Plaintiff alleges said "Finders Fees" are in fact sales commissions paid to unlicensed broker dealers in contravention of its 2013 Notice of Exempt Offering, and thus in violation of Section 29(b) of the Exchange Act of 1934.

59. On or about March 4, 2016, Plaintiff sent to SI a letter demanding the rescission of his total investment in SI, citing the previously mentioned failure to disclose sales commissions paid to Defendant Petrossi and others, persons acting as unlicensed broker dealers. (See **Exhibit 5**).

60. Between March 4, 2016 and May 4, 2016, Plaintiff received no substantive response to his demand. On May 4, 2016, Defendant SI finally responded to Plaintiff's letter of March 4, 2016 by not only refusing to honor Plaintiff's demand for rescission, but also denying Mr. Petrossi's intricate role in the sale of its securities.

61. Plaintiff is not the only Michigan resident to have been solicited for investment. SI's shareholder list, as of December 31, 2015, shows that SI has successfully solicited the investment of six (6) other shareholders from the State of Michigan.

**First Claim for Relief:**
**Securities Fraud**
**Count 1**
**Violation of Section 10b of the 1934 Act, 15 U.S.C. §78j(b); 17 CFR 240.10b-5; California Corporations Code §§ 25401 and 25501; Michigan Compiled Laws Service § 451.2509(2)**
**(As to Defendants SI, Williams, and Petrossi)**

62. Plaintiff hereby incorporates paragraphs 1 through 61 of this Complaint as though set forth in full at this point.

63. On or about July 23-26, 2013, at the Agora Financial Investment Symposium in Vancouver, British Columbia, Defendants made an untrue statement of material fact by stating that Nokia had entered into a contractual agreement with Defendant SI, wherein Defendant SI would have its software installed on every Nokia phone sold to consumers in the United States. Such statement was made in connection with the advertising and subsequent sale of Defendant SI's securities to Plaintiff.

64. Defendant Williams' statement regarding Defendant SI's deal with Nokia was untrue.

65. Defendants acted knowingly in making such statements, and in fact intended for investors to rely on such statements in determining whether to buy SI securities, as such statements were intentionally made to potential investors at an investment conference by Defendant Williams.

66. Defendants used an instrumentality of interstate commerce, the wires constituting the electronic mail (e-mail) and telephone system, in connection with the sale of securities to Plaintiff.

67. Plaintiff justifiably relied on Defendant Williams' and Petrossi's statement regarding Defendant SI's deal with Nokia in buying SI's securities, believing that said deal with Nokia would increase the stock price of Defendant SI, and thereafter provide a significant

16

return on investment.

68. Defendants' misrepresentation regarding SI's deal with Nokia caused Plaintiff to suffer damages because it was this untrue statement, which caused Plaintiff to invest in Defendant SI.

69. Defendants' conduct was malicious, fraudulent, extreme, outrageous and without legal justification, and punitive damages should be assessed against Defendants to punish their conduct and deter them and other from committing similar acts.

## Count 2
### (as to Defendants SI, Judd, Williams, Riaz, Blevin, and Rosen)

70. Plaintiff hereby incorporates paragraphs 1 through 69 of this Complaint as though set forth in full at this point.

71. Defendants SI, Judd, Williams, Riaz, Blevin, and Rosen made an untrue statement of material fact by stating on SI's 2013 Notice of Exempt Offering of Securities with the SEC that Defendant SI was not paying sales commissions to brokers or dealers in connection with the sale of its exempt securities.

72. This statement was not true.

73. Defendants acted intentionally and with knowledge that their statement regarding nonpayment of sales commissions was not true, as Defendants had, and continue to have, a relationship with Defendant Louis Petrossi, a former broker dealer who they had paid sales commissions in the past. In fact, Defendants knew they had already paid sales commissions in 2013 when Defendants represented SI would not pay commissions in connection with the 2013 offering.

74. Defendants utilized the instrumentalities of interstate commerce, the wires and the mail, in connection with the sale of Defendant SI's securities. Defendants utilized the mail and/or the wires to file its Notice of Exempt Offering of Securities with the SEC, and also utilized such means to send investors subscription agreements containing such misstatement.

17

75. Plaintiff justifiably relied on Defendants' representation in its filing with the SEC, and believed that his investment money would not be used to pay sales commissions.

76. The Defendants' misrepresentation caused Plaintiff to suffer damages, as Defendant SI has never turned a profit, and Defendants Judd and Williams have recently indicated that shareholders are likely to lose their investment.

77. Defendants' conduct was malicious, fraudulent, extreme, outrageous and without legal justification, and punitive damages should be assessed against Defendants to punish their conduct and deter them and other from committing similar acts.

<u>Second Claim for Relief:</u>
**Intentional Misrepresentation**

**Count 1**
**Michigan Common Law Fraud**
**(as to Defendants SI, Williams and Petrossi)**

78. Plaintiff hereby incorporates paragraphs 1 through 77 of this Complaint as though set forth in full at this point.

79. On or about February 17, 2011, Defendants Petrossi and Williams, acting as agents for Defendant SI at the Freedom Fest World Economic Summit, orally made a material misrepresentation of fact to Plaintiff that Defendant SI was in fact a profitable company immediately prior to Plaintiff electing to invest fifty thousand dollars ($50,000.00) in exchange for twenty-five thousand D-2 Units in Search Initiatives, LLC. These units later because Preferred Class E shares of equal value in SI.

80. This representation was in fact false because Defendant SI has never, in its entire existence, been profitable at any time.

81. Petrossi and Williams knew said statement to be false, or made it recklessly, without knowledge of its truth as a positive assertion.

82. Mr. Petrossi and Mr. Williams made this representation regarding Defendant SI's profitability with the intention that Plaintiff would act upon it, as Defendants made such material misrepresentation at an investment conference where participants of the

18

conference were in attendance for the sole purpose of considering potential companies in which to invest their money.

83. Plaintiff did in fact rely on Defendants' misrepresentation, and made such decision to invest in Defendant SI based solely upon their purported profitability. The statement that SI was profitable was critical to Plaintiff because he felt that SI was a safe company to invest in with profits already existing.

84. Plaintiff has suffered damages as a result of Defendants' statement in 2011, as Plaintiff's investment money is lost due to continued losses at a Company, which Defendants claimed to be profitable, but has always been in dire financial condition.

85. Defendants' conduct was malicious, fraudulent, extreme, outrageous and without legal justification, and punitive damages should be assessed against Defendants to punish their conduct and deter them and other from committing similar acts.

## Count 2
### California Civil Code §1709; Michigan Common Law Fraud
### (as to Defendants SI, Williams and Petrossi)

86. Plaintiff hereby incorporates paragraphs 1 through 85 of this Complaint as though set forth in full at this point.

87. On or about July 23-26, 2013, Defendants SI, Williams and Petrossi each misrepresented to Plaintiff that Defendant SI had entered into a contract with Nokia to place its software platform on all Nokia phones. This misrepresentation was made orally to investors by Defendants at the Agora Financial Investment Symposium in Vancouver, British Columbia in 2013. Following Mr. Williams' presentation regarding the Nokia deal, subscription agreements were passed out to potential investors, who were told that if they were interested in investing in the Company following the exciting news regarding the Nokia deal, they could mail their subscription agreement and check to the Company's headquarters in Southern California.

88. Defendants SI, Williams and Petrossi knew that the Nokia deal had not yet been

executed, finalized and binding at the time Defendants' announcement had been made. This knowledge that the deal had not yet been completed, thus making it binding, made the statement by Defendants misleading and false.

89. Defendants' misrepresentation regarding the status of the Nokia deal was material because such a deal with Nokia for the Company's software to be on all U.S. Nokia phones would have substantially increased the Company's revenue. Such expected revenue increase significantly enhanced its appeal to investors, such as the Plaintiff.

90. Defendants intended to induce Plaintiff to rely on its misrepresentation regarding the Nokia deal. Defendants, and each of them, knew that by stating that SI had entered into a contract with Nokia, it would significantly enhance the perceived value of the SI investment opportunity to Plaintiff and other investors. Defendants intended that such perceived enhanced value would correspondingly result in increased investment.

91. Plaintiff reasonably relied upon the representation by Defendants regarding SI's deal with Nokia, and based upon this false statement, invested a significant amount of money in SI.

92. Plaintiff was justified in relying upon Defendants' representation that SI had entered into a deal with Nokia to place its signature software product on all Nokia phones because this was exactly the type of business which SI was attempting to procure for its product. Additionally, the announcement was made by, among others, the Company's Chief Financial Officer/Director.

93. Plaintiff has been substantially harmed by Defendants' misrepresentation because such misrepresentation caused Plaintiff to invest an additional one hundred thousand dollars ($100,000.00) in the Company. Had such misrepresentation not been made, Plaintiff would not have invested more money in the Company. Said shares are presently virtually worthless.

94. Defendants' conduct was malicious, fraudulent, extreme, outrageous and without legal justification, and punitive damages should be assessed against Defendants to punish their conduct and deter them and other from committing similar acts.

**Count 3**

**Michigan Common Law Fraud; California Civil Code §1709
(as to Defendants SI, Judd, Williams, Riaz, Blevin, and Rosen)**

95. Plaintiff hereby incorporates paragraphs 1 through 94 of this Complaint as though set forth in full at this point.

96. Defendants SI, Judd, Williams, Riaz, Blevin, and Rosen misrepresented to Plaintiff that SI was not paying sales commissions to licensed and/or unlicensed broker dealers in connection with the sale of its exempt securities. Such representation was made in Defendant SI's 2013 Notice of Exempt Offering of Securities with the SEC.

97. Defendants knew that this representation was false when made to the public, *via* the SEC on May 31, 2013, because Defendants had already sold equity securities to investors utilizing such unlicensed broker dealer(s), and thereafter paid commissions. SI's general ledger shows sales commission payments disguised as "Finders Fees" paid to at least Petrossi, Jensen, and Doe.

98. Defendants' misrepresentation was material. Defendant SI paid at least $575,000 to unlicensed and undisclosed broker dealer(s) in 2013. Additionally, Defendant SI was paying an exorbitantly high commission rate on all money raised by such undisclosed and unlicensed broker dealer(s), ten percent (10%) of the investment solicited. Such percentage is significantly higher than acceptable "Finders Fees" and is exactly the same percentage Defendant SI later agreed to pay Maxim Group, LLC, a licensed and disclosed broker dealer registered with FINRA, in connection with their 2015 private placement offering.

99. Defendants intended to induce Plaintiff to rely on its misrepresentation. Defendants knew that by understating and/or failing to disclose the commissions being paid to unlicensed and undisclosed broker dealer(s), Plaintiff would be more likely to invest in Defendant SI because Plaintiff would believe that all or a larger percentage of his investment funds were being utilized for company operations.

21

100. Plaintiff reasonably relied upon the representations Defendants made in SI's public disclosure documents with the SEC when deciding whether to invest in Defendant SI.

101. Plaintiff was justified in relying upon Defendants' representation that it was not paying unlicensed and undisclosed broker dealer(s) sales commissions because such information was also represented to the Securities and Exchange Commission as being true.

102. Plaintiff has been substantially harmed by Defendants' misrepresentation because such misrepresentation caused Plaintiff to invest in a Company that was divesting itself of ten percent of every investment dollar it generated, thus significantly decreasing the likelihood that Plaintiff would see a return on his investment. To date, Plaintiff has seen no return on his investment, and per the recent statements of SI's management, likely will never see a return of his investment.

103. Defendants' conduct was malicious, fraudulent, extreme, outrageous and without legal justification, and punitive damages should be assessed against Defendants to punish their conduct and deter them and other from committing similar acts.

### Third Cause of Action
**Negligent Misrepresentation**
**California Civil Code §§ 1709 and 1710**

### Count 1
**(as to Defendants SI, Williams and Petrossi)**

104. Plaintiff hereby incorporates paragraphs 1 through 103 of this Complaint as though set forth in full at this point.

105. On or about July 23-26, 2013, Defendant SI, through its agents Williams and Petrossi, misrepresented to Plaintiff that Defendant SI had entered into a contract with Nokia to place its software platform on all Nokia phones. This misrepresentation was made orally to investors by Defendants Williams and Petrossi at the Agora Financial Investment Symposium in Vancouver, British Columbia. Following Defendants' presentation regarding the Nokia deal, subscription agreements were passed out to potential investors, who were told that if they were interested in investing in the Company following the

exciting news regarding the Nokia deal, they could mail their subscription agreement and check to the Company's headquarters in Southern California.

106. The representation made by the Defendants, and each of them, regarding the Nokia deal was not true.

107. Defendants SI, Williams and Petrossi had no reasonable grounds to believe the Nokia deal had been executed, finalized and was binding upon Nokia at the time SI's announcement was made. This knowledge that the deal had not yet been completed, thus making it binding, made the statement by Defendants, and each of them, misleading and false.

108. Defendants intended to induce Plaintiff, and other investors, to rely on this misrepresentation regarding the Nokia deal. Defendants knew that by stating that SI had entered into a contract with Nokia, it would significantly enhance the perceived value of the SI investment opportunity to Plaintiff and other investors. Defendants intended that such perceived enhanced value would correspondingly result in increased investment.

109. Plaintiff reasonably relied on Defendants' representation regarding the Nokia deal. Plaintiff justifiably believed that Defendant Ralph Williams, Defendant SI's Chief Financial Officer and a Director, was making an honest statement regarding the existence of a valid, binding contract with Nokia that would allow the Company's signature product to be placed on all of Nokia's phones. Such a deal would significantly enhance the value of the Company's stock.

110. Plaintiff has been substantially harmed by Defendants' misrepresentation because such misrepresentation caused Plaintiff to invest an additional one hundred thousand dollars ($100,000.00) in the Company.

111. Plaintiff's reliance on Defendants' representation was a substantial factor in causing his harm because had such misrepresentation not been made, Plaintiff would not have invested more money in the Company.

///////////////

### Count 2
### (as to Defendants SI, Judd, Williams, Riaz, Blevin, and Rosen)

112. Plaintiff hereby incorporates paragraphs 1 through 111 of this Complaint as though set forth in full at this point.

113. Defendants SI, Judd, Williams, Riaz, Blevin, and Rosen misrepresented to Plaintiff that SI was not paying sales commissions to licensed and/or unlicensed broker dealers in connection with the sale of its exempt securities. Such representation was made in Defendant SI's 2013 Notice of Exempt Offering of Securities with the SEC.

114. Defendants' misrepresentation was not true, as SI's general ledger shows sales commission payments disguised as "Finders Fees" paid to at least Petrossi, Jensen, and Doe.

115. Defendants had no reasonable grounds to believe that this representation was true, as SI had paid commissions to Defendant Louis Petrossi and/or others in the months prior to SI filing its Notice of Exempt Offering of Securities with the SEC on May 31, 2013. Within this notice, Defendant SI made the affirmative representation that it was not going to be paying any sales commissions in connection with the sale of its exempt securities.

116. Defendants' misrepresentation was material. Defendant SI paid at least $575,000 to unlicensed (Petrossi) and/or undisclosed broker dealer(s) (Doe and Jensen) in 2013. Additionally, Defendant SI was paying an exorbitantly high commission on all money raised by such undisclosed and unlicensed broker dealer(s), ten percent of the investment solicited. Such percentage is significantly higher than acceptable "Finders Fees" and is exactly the same percentage Defendant SI later agreed to pay Maxim Group, LLC, a licensed and disclosed broker dealer registered with FINRA, in connection with their 2015 private placement offering..

117. Defendants intended to induce Plaintiff to rely on its misrepresentation. Defendants knew that by failing to disclose the commissions being paid to unlicensed and

24

undisclosed broker dealer(s), Plaintiff would be more likely to invest in Defendant SI because Plaintiff would believe that all or a larger percentage of his investment funds were being utilized for company operations, thus making the investment appear safer.

118. Plaintiff reasonably relied upon the representations Defendants made in their public disclosure documents when deciding whether to invest in Defendant SI.

119. Plaintiff was justified in relying upon Defendants' representation that it was not paying unlicensed and undisclosed broker dealer(s) sales commissions because such information was also represented to the Securities and Exchange Commission as being true.

120. Plaintiff was harmed as a result of this misrepresentation by agreeing to purchase an additional one hundred thousand dollars worth of Defendant SI's equity shares. This misrepresentation was a substantial factor in causing Plaintiff's harm, as Plaintiff would not have invested further in the Company had SI disclosed that it was paying ten percent commissions to unlicensed broker dealer(s) in connection with the sale of its securities.

### Fourth Cause of Action
### Michigan Common Law Innocent Misrepresentation
### (as to Defendants SI, Williams and Petrossi)

121. Plaintiff hereby incorporates paragraphs 1 through 120 of this Complaint as though set forth in full at this point.

122. On or about February 17, 2011, Defendant SI, through its agents Williams and Petrossi, made a misrepresentation of material fact when each verbally represented to Plaintiff that SI was a profitable company.

123. This misrepresentation was made in connection with the making of a contract between Plaintiff and Defendant SI, as SI was soliciting potential investors, like Plaintiff, at an investment conference and thereafter received an investment of $50,000 from Plaintiff for equity shares in SI.

124. This representation regarding the profitability of the Company was false when it was made, as the Company was not profitable at that time, nor has it ever been profitable in

its existence.

125. Plaintiff would not have entered into the subscription agreement contract if SI's agents, Williams and Petrossi, had not made the representation.

126. Plaintiff has sustained a loss of $50,000 as a result of entering into this subscription agreement contract, as the Company has informed Plaintiff and other shareholders that the Company is on the verge of collapse without further investment.

127. Plaintiff's loss benefited Defendant SI because it obtained the beneficial use of the $50,000 investment made by Plaintiff.

### Fifth Claim for Relief:
**Rescission of Contract Pursuant to §29(b) of the 1934 Act for Violation of Section 15(a) of the 1934 Act, 15 U.S.C. §78o**
**(as to Defendants SI and Petrossi)**

128. Plaintiff hereby incorporates paragraphs 1 through 127 of this Complaint as though set forth in full at this point.

129. Mr. Petrossi engaged in the interstate business of effecting securities transactions for the account of another, without being registered with the Securities and Exchange Commission, as a broker or dealer, in violation of Section 15(a) of the Securities Exchange Act.

130. Mr. Petrossi assisted in the location and solicitation of prospective investors in SI to purchase SI securities, marketed the SI securities to investors, advised potential investors as to the merits of a SI investment, and accepted commission payments of ten percent (10%) as compensation in a manner that was linked in whole or in part to the successful sale of Search Initiative's securities, including the securities purchased by Plaintiff. Mr. Petrossi's acts and omissions were undertaken with the consent, approval, and authority of the Company Defendants, as Mr. Williams was physically present at locations where Mr. Petrossi was performing such illegal actions.

131. Additionally, Mr. Petrossi also acted as a dealer on twenty-nine separate occasions by purchasing, selling, and transferring shares of Search Initiatives for the account of others.

132. Mr. Petrossi is not a registered broker-dealer pursuant to Section 15(a) of the Securities Exchange Act or otherwise, however, Mr. Petrossi was previously a registered broker-dealer under license number CRD# 723168.

133. Section 29(b) of the Securities Exchange Act, 15 U.S.C. §78cc provides for the rescission of a contract if the contract violates any provision of the Securities Exchange Act or regulations promulgated thereunder. Accordingly, because Mr. Petrossi received commission payments while acting pursuant to a contract wherein he acted as an unregistered broker-dealer in violation of Section 15(a) of the Securities Exchange Act, Plaintiff is entitled to rescind the contracts for the purchase of SI securities. Plaintiff thus prays for the repayment of $192,500.00, equaling that amount which was paid to SI in exchange for securities that were sold in violation of the Securities Exchange Act as described herein.

### Sixth Cause of Action
**Violations of Section 20(a) of the Exchange Act; California Corporations Code Section 25403; Michigan Compiled Laws Service § 451.2509(7)(a-b)**
**(Against Defendants Judd, Williams, Riaz, Blevins, and Rosen)**

134. Plaintiff hereby incorporates paragraphs 1 through 133 of this Complaint as though set forth in full at this point.

135. Defendants Judd, Williams, Riaz, Blevin, and Rosen participated in the operation and management of Defendant SI, and conducted and participated, directly and indirectly, in the conduct of SI's business affairs. Because of their senior positions, they knew and sanctioned the use of the egregious misrepresentations in the solicitation of investment funds. Additionally, Defendants knew and sanctioned the use of unlicensed and undisclosed broker dealers in violation of Section 15(a) of the Exchange Act of 1934.

136. As officers and/or directors of Defendant SI, Defendants Judd, Williams, Riaz, Blevin, and Rosen had a duty to ensure that all of Defendant SI's investment funds were raised in accordance with state and federal laws, and if a violation was discovered, to thereafter correct such illegal activity

27

137. Because of their positions of control and authority as senior officers and directors, Defendants Judd, Williams, Blevin, Riaz, and Rosen were able to, and did, control the investment fundraising activities of Defendants Petrossi and Williams. These Defendants exercised their power and authority to encourage and cause Petrossi and Williams to engage in the unlawful activities complained of herein. These Defendants therefore, were "controlling persons" of Defendant SI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged.

138. Each of Defendants Judd, Williams, Blevin, Riaz, and Rosen, therefore, acted as a controlling person of Defendant SI. By reason of their senior management positions and/or being directors of SI, each of these Defendants had the power to direct the actions of, and exercised the same to cause, SI to engage in the unlawful acts and conduct complained of herein. Each of these Defendants exercised control over the general operations of SI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains.

139. By reason of the above conduct, Defendants Judd, Williams, Riaz, Blevin, and Rosen are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Defendants SI, Petrossi and Does 1 through 10.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the relief as set forth below:

A. Actual damages, statutory damages, punitive damages, and su ch other relief as provided by the statutes cited herein;

B. Rescission of the 2013 Subscription Agreement Contract pursuant to Section 29(b) of the Exchange Act of 1934;

C. Pre-judgment and post-judgment interest on such monetary relief;

D. Equitable relief in the form of an injunction prohibiting the illicit conduct described herein;

1    E.  Costs of suit;

2    F.  Interest at six percent (6%) from the date of purchase of the Search Initiatives securities

3        complained of herein pursuant to Michigan Compiled Laws Service § 451.2509;

4    G.  Attorney's fees pursuant to Michigan Compiled Laws Service § 451.2509, as Plaintiff has

5        undertaken extensive and reasonable efforts to resolve this matter without the necessity

6        for Court involvement; and

7    H.  All other relief to which Plaintiff may be entitled at law or equity.

8

9    Respectfully submitted,                                    Anderson Hayes, P.C.

10

11   DATE: 07/18/16                                             By: _____
                                                                Ryan S. Anderson,
12                                                              Attorney for Plaintiff John Erving, an
                                                                individual and Trustee of the John Erving
13                                                              Family Trust

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28